# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 22-0879V

| | |
|---|---|
| J.S.,<br><br>                    Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                    Respondent. | Chief Special Master Corcoran<br><br>Filed: April 29, 2024<br>Re-filed as Redacted: July 2, 2024 |

*Elizabeth Kyla Abramson*, Maglio Christopher & Toale, P.A., Washington, DC, for Petitioner.

*Sarah Black Rifkin*, U.S. Department of Justice, Washington, DC, for Respondent.[1]

## DECISION AWARDING DAMAGES[2]

On August 10, 2022, J.S. filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[3] (the "Vaccine Act"). Petitioner alleges that he suffered Guillain-Barré syndrome ("GBS") resulting from an influenza ("flu") vaccine received on October 3, 2020. Petition at 1-11. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters.

---

[1] Shelly Jock appeared for Respondent at the April 26, 2024 Motions Day hearing.

[2] When this Decision was originally filed, I advised my intent to post it on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). In accordance with Vaccine Rule 18(b), Petitioner filed a timely motion to redact certain information. This decision is being posted with Petitioner's name redacted to reflect his initials only. Except for those changes and this footnote, no other substantive changes have been made. This Decision will be posted on the court's website and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc with no further opportunity to move for redaction.

[3] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

For the reasons set forth below, I find that Petitioner is entitled to an award of damages in the amount of **$189,510.57, comprised of $178,000.00 for actual pain and suffering, $6,828.80 in lost earnings, and $4,681.77 in unreimbursable expenses.**

### I.   Relevant Procedural History

The case was activated on September 15, 2022 (ECF No. 10). Respondent conceded entitlement, and the parties entered into damages negotiations (ECF Nos. 23-28). However, they reached an impasse (ECF No. 29). On July 17, 2023, Petitioner filed a motion for a ruling on the record addressing damages (ECF No. 31). Respondent reacted (ECF No. 34), and Petitioner replied (ECF No. 35).

On March 25, 2024, the parties filed a joint status report confirming that they were amenable to an expedited hearing on "Motions Day," and were available for this purpose on April 26, 2024 (ECF No. 40). The Motions Day hearing occurred as scheduled on April 26, 2024, and this written decision memorializes my oral ruling issued at the conclusion of the hearing.[4]

### II.   Relevant Factual Evidence

#### A. Medical Records

Petitioner had a pre-vaccination medical history of diabetes, hypertension, hyperlipidemia, and erectile dysfunction. Ex. 10 at 125; Ex. 14 at 231. On October 3, 2020, Petitioner, then 66 years old, received flu and pneumococcal vaccines in his left deltoid. Ex. 1. Ten days later, he went to the emergency department, reporting a two day history of ascending weakness. Ex. 4 at 29. He had awoken the day before with numbness in both feet and was weak "all over," with the numbness and weakness becoming progressively worse. *Id.* He had been falling at home and could not ambulate. *Id.* On examination, he had bilateral lower extremity weakness and absent patellar reflexes. *Id.* at 33. A CT scan of his brain was done, and a lumbar puncture was attempted four times without success in the emergency department. *Id.* at 33, 42, 43. He was admitted to the intensive care unit with concern for GBS. *Id.* at 99-100.

A repeat lumbar puncture the next day (October 14, 2020) was successful and revealed elevated protein. Ex. 4 at 18, 171. His neurologist, Dr. James Fleming, determined that Petitioner's history, clinical exam, and lumbar puncture results were

---

[4] That ruling will be set forth in the transcript from the hearing, which has not yet been filed but is fully incorporated into this Decision.

consistent with acute demyelinating polyneuropathy, a form of GBS, and ordered IVIG. *Id.* at 143. An MRI of his cervical spine was attempted, without success. *Id.* at 183.

Petitioner remained hospitalized for eleven days. Ex. 4 at 101. He was treated with gabapentin and five days of IVIG, with some improvement. *Id.* at 102, 166. Even after completing IVIG, he continued to be very weak and have severe back pain. *Id.* at 221. He had significant pain and weakness in his upper and lower extremities that was well-controlled with opiates for a time. *Id.* at 102. However, he developed colonic distention and an ileus, resulting in decompression via nasogastric and rectal tubes, and opiates were therefore stopped. *Id.* at 102, 246, 254, 269. He was discharged to inpatient rehabilitation for continued strengthening. *Id.*

Petitioner remained in inpatient rehabilitation for 32 days, from October 24 to November 25, 2020. Ex. 3 at 209. On admission, he had moderate impairment in upper extremity coordination, severe impairment in lower extremity coordination, and severe impairment in his shoulder range of motion. *Id.* at 219. After several adjustments, adequate pain control was achieved. *Id.* at 210. He did physical, occupational, and speech therapy. *Id.* He was discharged home in stable condition on November 25, 2020. *Id.*

After going home, Petitioner continued care with his primary care physician, Dr. Martha Ziegler, for lingering effects of GBS and other health concerns. Ex. 10 at 56. On December 4, 2020, he still felt decreased strength and sensation in his lower and upper extremities. *Id.* at 58. He was advised to continue physical therapy ("PT") on an outpatient basis. *Id.* at 59.

Petitioner continued outpatient PT and occupational therapy for nearly two months and was discharged on January 20, 2021, with instructions to continue exercises at home. Ex. 3 at 263-67. At discharge, he was "a whole lot better." *Id.* at 263. A month earlier, he had been afraid he would never walk again. *Id.* Now, his main problem was balance, burning pain in his feet and fingers, and difficulty sleeping. *Id.* He showed improvement in standing and stepping over items, but had difficulty getting up from low surfaces. *Id.* He reported tingling pain in his feet and fingertips ranging from two to six out of ten. *Id.* at 264. On examination, he had normal range of motion but reduced strength in his hip, knee, and ankle/foot. *Id.* He was assessed with "[m]uch improved balance and mobility as evidenced by outcome measures." *Id.* at 266. He had met six out of seven treatment goals, and was determined not to need further skilled PT. *Id.*

A month later (February 23, 2021), Petitioner saw Dr. Ziegler reporting that he had fallen a week earlier, landing on his right hip on a hard floor. Ex. 10 at 38. He reported a pain level of two out of ten. *Id.* He had self-treated with acetaminophen, ice, and elevation, with moderate relief. *Id.* On examination, his right hip had a four centimeter hematoma and was mildly tender to palpation. *Id.* at 40. Dr. Ziegler recommended that he rest, apply heat, and take Tylenol as needed for pain. *Id.*

Petitioner saw neuromuscular specialist Dr. Joshua Alpers on March 5, 2021 for an evaluation and electrodiagnostic testing. Ex. 6 at 4-5. Petitioner was not experiencing overt sensory loss, but continued to have paresthesias in both hands and feet, as well as upper extremity weakness, poor balance, and falls. *Id.* at 4. On examination, he had reduced sensation. *Id.* at 5. Dr. Alpers performed an EMG and nerve conduction study. *Id.* The results were abnormal, with evidence of sensorimotor polyneuropathy consistent with resolving GBS. *Id.* Dr. Alpers did not think the results suggested chronic demyelinating polyneuropathy or premorbid diabetic neuropathy. *Id.*

Dr. Ziegler cleared Petitioner to return to work with a restriction of no lifting greater than five pounds on March 29, 2021. Ex. 10 at 6-10. Petitioner was still on Gabapentin, and was able to walk with a cane and do all usual activities of daily living. *Id.*

Petitioner returned to Dr. Ziegler on June 17, 2021 for fatigue, numbness, and weakness. Ex. 15 at 117. On examination, his coordination and gait were normal, but he exhibited motor weakness, sensory deficits, and abnormal reflexes. *Id.* at 118. Dr. Ziegler discussed the long term effects of GBS and advised Petitioner to continue exercise, rest, and increased fluids. *Id.* at 119.

On October 12, 2021, Petitioner saw urologist Dr. Anand Shridharani. Ex. 14 at 230. His erectile dysfunction had previously been responsive to medication, but after his GBS hospitalization this was no longer the case. *Id.* at 71, 231. As a result, he underwent surgical implantation of an inflatable penile prosthesis on December 13, 2021. *Id.* at 47. By March 2022, Petitioner was doing well with no restrictions. Ex. 16 at 7.

Petitioner saw Dr. Ziegler on April 28, 2022. Ex. 20 at 28. He had numbness in his feet, which Dr. Ziegler attributed to diabetic neuropathy. *Id.* at 30. Petitioner saw Dr. Ziegler again two months later (June 28, 2022) for an annual physical. *Id.* at 6. Petitioner reported that he still had some weakness in his arms and legs from GBS. *Id.* at 7. On examination he had motor weakness and sensory deficits, with normal gait, coordination, and reflexes. *Id.* at 9.

### B. Declarations

Petitioner submitted three declarations in support of his claim. Exs. 12, 18, 28. In them he notes that he began feeling tingling and burning in his hands and feet, and feeling off-balance, nine days after vaccination. Ex. 18 at ¶ 2. The next day, he tried to get out of bed but fell and could not get back up. *Id.* at ¶ 3. His daughter and son in law came and helped him up, and took him to the hospital. *Id.*

By the time he was diagnosed with GBS, his "entire body was burning and tingling." Ex. 18 at ¶ 6. He was in horrible pain and could not walk or even roll over in bed. *Id.* He

4

described the pain as "like being burnt all over my body," and it was bad enough to make him "want to die." *Id*.

He recalled a situation that occurred while he was in the intensive care unit of the hospital. He needed to use the restroom, but his call button was not working, and he could not get himself to the bathroom. Ex. 18 at ¶ 7. He soiled himself, and was left to lay in it for hours. *Id*. While he was hospitalized, visitors were limited due to the COVID-19 Pandemic; as a result, he was alone most of the time, which made it even worse. *Id*. at ¶ 8.

He has worked hard to recover from GBS. Ex. 18 at ¶ 9. In June 2021, he began working with a personal trainer at a gym, who researched GBS and designed an exercise plan to help Petitioner get stronger and improve his balance. *Id*.

Before his GBS, Petitioner enjoyed fly fishing, hunting, and training his "squirrel dogs." Ex. 18 at ¶ 10. He spent a lot of time outdoors in the woods and mountains, and was independent and active in his hobbies, work, and home. *Id*. Now, he has trouble feeling his feet, and has to be careful when walking to make sure he picks up his feet so he does not trip. Ex. 28 at ¶ 2. Because of these residual symptoms, he is no longer comfortable going out into the woods or fishing alone. *Id*. at ¶ 3.

Petitioner feels like he has lost his independence because of his GBS. Ex. 18 at ¶ 12. When he was discharged from the inpatient rehabilitation hospital, he had to live with his brother for four months, and needed family to take care of his dogs and drive him to appointments. *Id*. His left arm remains much weaker than his right arm. *Id*. at ¶ 13. His legs remain weak and cause problems, such as difficulty squatting to look at items on low shelves in a store. *Id*. at ¶ 15. He recalled a situation when he was at a hardware store looking at an item on the bottom shelf. *Id*. To read the details on the item, he had to sit on the floor, but then was unable to stand back up on his own and had to call his brother to come and help him. *Id*.

Petitioner tried walking on a treadmill to strengthen his legs, but his left leg kept giving out. Ex. 18 at ¶ 16. He recalled that one time he was on the treadmill and fell, and was flung back into a woman who had been walking behind the treadmill. *Id*. In the process, he knocked her down, and both Petitioner and the woman were hurt. *Id*. He stopped using the treadmill after that. *Id*.

His leg and feet symptoms worry and scare him. Ex. 18 at ¶ 17. When he gets stuck sitting on the floor, it is frightening because he doesn't know if or when someone will help him up. *Id*. It embarrasses him to need help getting up, especially in public. *Id*.

Although his overall health has improved, he is not back to his pre-GBS baseline. Ex. 28 at ¶ 2. He estimates that he has lost about two thirds of his strength due to GBS, with his left arm being particularly weak. *Id*. at ¶ 4. He continues to have trouble returning to standing from a low squat due to weakness. *Id*. He continues to have double vision

from GBS, and now needs special glasses to correct it. *Id.* at ¶ 5. He continues to take gabapentin for nerve pain at times. *Id.* at ¶ 7. Petitioner also worries about getting the flu or covid, since he is high risk due to age, and has been advised not to get more vaccines. Ex. 18 at ¶ 20. He has tried to maintain a positive attitude, but his life now is very different than it was before GBS. *Id.* at ¶ 21.

In addition, Petitioner had erectile dysfunction prior to GBS, but it responded to medication. Ex. 18 at ¶ 18. After his GBS, however, his condition no longer responded to medication. *Id.* His doctor told him this was likely due to nerve damage. *Id.* As a result, he had an implant surgically placed to address his erectile dysfunction. *Id.* at ¶ 19. However, he states he is having problems with the implant, and always worries whether it will work or not, and lately has been having problems with the release valve. *Id.* This has been embarrassing, and he is having a hard time dealing with this emotionally. *Id.* He has remarried, and is not comfortable talking with his wife about his surgery to correct erectile dysfunction. Ex. 28 at ¶ 6. On the positive side, his experience with GBS has strengthened his faith and relationships and motivated him to take care of his body, resulting in significant improvements in his diabetes. *Id.* at ¶ 8.

When Petitioner was first diagnosed with GBS, he was unable to work for about five months. Ex. 28 at ¶ 9. He had a lot of accrued sick leave, which he used, and thus he continued receiving a paycheck. *Id.* However, using that sick leave meant that he lost a significant number of creditable service hours that would have factored into the monthly payments he receives when he retires (which he plans to do around June 2024). *Id.* at ¶¶ 9, 11.

### III. Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a

mathematical formula"); *Stansfield v. Sec'y of Health & Human Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Human Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims.[5] *Hodges v. Sec'y of Health & Human Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

### IV. The Parties' Arguments

#### A. Pain and Suffering

Petitioner proposes an award comprised of pain and suffering, lost earnings, and out of pocket expenses. Petitioner's Motion for Damages, filed July 17, 2023, at *8 (ECF No. 31) ("Mot."). The parties agree that Petitioner is entitled to $6,828.80 in lost wages, and $3,644.49 for out-of-pocket expenses exclusive of mileage. Petitioner's Reply, filed Oct. 5, 2023, at *1 (ECF No. 35) ("Reply"). The parties' disagreement on damages is limited to two matters: (1) the amount of damages for pain and suffering, and (2) whether Petitioner's travel expenses for his medical treatment should be reimbursed at the IRS mileage rate for business travel, as Petitioner proposes, or the medical rate, as Respondent suggests.

Petitioner proposes a pain and suffering award of $180,000.00, citing *Clemens, Hood, McCray, Devlin,* and *Presley*.[6] Mot. at *10-19. At the Motions Day hearing,

---

[5] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of GBS claims, were assigned to former Chief Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

[6] *Clemens v. Sec'y of Health & Human Servs.*, No. 19-1547V, 2022 WL 2288515 (Fed. Cl. Spec. Mstr. May 17, 2022) ($180,000.00 awarded for actual pain and suffering); *Hood v. Sec'y of Health & Human Servs.*, No.16-1042V, 2021 WL 5755324 (Fed. Cl. Spec. Mstr. Oct. 19, 2021) ($200,000.00 awarded for actual pain

7

Petitioner cited *Ruppert*,[7] which was decided after this case was briefed. Petitioner emphasizes that he was hospitalized for 11 days and spent 32 days in an inpatient rehabilitation facility, underwent a five-day course of IVIG, treated with gabapentin and opioids for pain, and treated with physical and occupational therapy. *Id.* at *11. During treatment, he developed an ileus, requiring placement of a rectal tube and discontinuation of opioids. *Id.*

When Petitioner was discharged, he was unable to return to his own home, instead living with his brother for four months. Mot. at *11. He then participated in 12 sessions of PT and nine sessions of occupational therapy on an outpatient basis. Reply at *4 n. 2. Despite the extensive therapy, he continued to experience residual numbness and weakness, resulting in frequent falls and some injuries. Mot. at *12. He relied on a cane to walk. *Id.* He estimates he has lost two thirds of his strength due to GBS, and continues to have difficulty picking up objects with his left arm and getting up from a low squat. *Id.* Because of continued difficulty feeling his feet, he has to walk with care to avoid tripping, and has had to curtail and alter his lifestyle and hobbies. *Id.* at *12-13. His GBS exacerbated his pre-existing erectile dysfunction, resulting in a surgical procedure, which has been embarrassing and emotionally difficult. *Id.* at *13.

Petitioner argues that he was of a similar age as the petitioners in *McCray*, *Devlin*, and *Presley*. Mot. at *17. He had a history of neuropathic symptoms, like the *McCray* and *Presley* petitioners. *Id.* Petitioner lived independently in a rural area, like the *Presley* petitioner. *Id.* Petitioner's hospitalization was similar in duration to that of the petitioner in *Devlin*, but Petitioner's inpatient rehabilitation stay was far longer than that of any of the petitioners in the cases he cites. *Id.* at *18. Petitioner endured several failed lumbar puncture attempts, like the *Presley* petitioner. *Id.*

Overall, Petitioner contends, he experienced a moderately severe course of GBS. Reply at *2-3. Petitioner emphasizes the length of his hospital and inpatient rehabilitation stay, diagnostic testing, treatment with IVIG, gabapentin, opioids, PT, and occupational therapy, as well as his ileus complication and exacerbation of his erectile dysfunction. *Id.* at *3-4. More broadly, prior to his GBS, Petitioner lived an active, independent lifestyle, which was curtailed by his GBS. *Id.* at *5. Petitioner experienced severe pain, fear,

---

and suffering, in addition to $1,000.00 per year for future pain and suffering); *McCray v. Sec'y of Health & Human Servs.*, No.19-0277V, 2021 WL 4618549 (Fed. Cl. Spec. Mstr. Aug. 31, 2021) ($180,000.00 awarded for actual pain and suffering); *Devlin v. Sec'y of Health & Human Servs.*, No. 19-0191V, 2020 WL 5512505 (Fed. Cl. Spec. Mstr. Aug. 7, 2020) ($180,000.00 awarded for actual pain and suffering); and *Presley v. Sec'y of Health & Human Servs.*, No. 17-1888V, 2020 WL 1898856 (Fed. Cl. Spec. Mstr. Mar. 23, 2020) ($180,000.00 awarded for actual pain and suffering).

[7] *Ruppert v. Sec'y of Health & Human Servs.*, No. 18-1621V, 2023 WL 9063679 (Fed. Cl. Spec. Mstr. Nov. 30, 2023) ($180,000.00 awarded for actual pain and suffering).

anxiety, and embarrassment during four failed lumbar puncture attempts, several unsuccessful MRIs, and placement of a rectal tube. *Id.*

In Petitioner's view, Respondent also fails to give proper weight to the GBS sequelae Petitioner continued to experience after hospitalization, apparently due to Respondent not considering Petitioner's declarations. Reply at *6. Petitioner takes issue with Respondent's reliance on proffered cases, noting that the court has admonished Respondent for doing so on numerous occasions. *Id.* at *8 (citing *Felland v. Sec'y of Health & Human Servs.*, No. 20-406V, 2022 WL 10724100, at *3 (Fed. Cl. Spec. Mstr. Sept. 6, 2022), and *Sakovits v. Sec'y of Health & Human Servs.*, No. 17-102V, 2020 WL 3729420), at *4 (Fed. Cl. Spec. Mstr. June 4, 2020)).

Petitioner acknowledges that his cited cases are not identical to his, but asserts that is "hardly surprising given the complexity of neurologic disorders and the individual circumstances that influence not only one's clinical course, but ability to adapt one's lifestyle to the limitations imposed by the condition." Reply at *9-10. Petitioner agrees that a higher award was warranted in *Hood*, which he has acknowledged by requesting a lower sum than awarded in that case. *Id.* at *11 n.3.

Respondent proposes a pain and suffering award of $135,000.00. Respondent's Brief on Damages, filed Sept. 28, 2023, at *6-10 (ECF No. 34) ("Resp."). Respondent argues that Petitioner's clinical course and treatment demonstrate a less severe course of GBS compared to other cases. *Id.* at *7. Respondent emphasizes that Petitioner was hospitalized for 11 days and inpatient rehabilitation for another 31 days, with a single round of IVIG therapy for five days. *Id.* After discharge, Respondent asserts that Petitioner attended only ten outpatient sessions of PT or occupational therapy and was discharged with a good prognosis. *Id.* Respondent views as significant that the majority of Petitioner's care occurred during the immediate three months after his GBS diagnosis and hospitalization. *Id.* at *8.

Respondent argues that five months after his GBS diagnosis, Petitioner was cleared to return to work and was able to perform his daily life activities. Resp. at *8. After this, he had very little GBS-related medical care. *Id.* Petitioner did not seek further neurological care, and his later primary care visits were for his pre-existing diabetes. *Id.* His December 2021 penile prosthesis surgery addressed a pre-existing problem that required different care after his GBS. *Id.* And while Petitioner continued to experience numbness in his feet, by April 2022 Dr. Ziegler attributed this to his diabetic neuropathy. *Id.*

Respondent further maintains that Petitioner's case was less severe than any of the cited cases. Resp. at *8-10. However, Respondent does not cite any reasoned GBS damages decision in support of his proposed award, referencing instead only three proffered cases, *Drapiewski v. Sec'y of Health & Human Servs.*, No. 21-1296V (Fed. Cl. Spec. Mstr. Nov. 23, 2022); *Schmidt v. Sec'y of Health & Human Servs.*, No. 17-913V

9

(Fed. Cl. Spec. Mstr. Apr. 30, 2019), and *Mickles v. Sec'y of Health & Human Servs.*, No. 19-2012V (Fed. Cl. Spec. Mstr. March 2, 2021). Resp. at *10.

### B. Mileage Rate for Travel Expenses Related to Vaccine Injury

Petitioner requests $1,037.28 for vaccine-related travel expenses, while Respondent proposes that $299.13 should be awarded for this mileage. Reply at *11; Resp. at *14.

Petitioner asserts that the IRS "business rate" is the appropriate reimbursement rate for mileage. Mot. at *10, Reply at *11-16. Petitioner argues that Congress did not provide specific direction as to how, or whether, IRS rates were to be applied in the Vaccine Program. Reply at *14. Rather, Congress gave special masters wide discretion to determine the appropriate amount of compensation to be awarded. *Id*. The use of IRS rates "is in no way required of special masters" – but can allow special masters to quickly and easily determine the full amount of compensation allowed for mileage expenses incurred by petitioners. *Id*.

Petitioner argues that Respondent's argument that fixed costs – which are accounted for in the "business rate" but not the "medical rate" – do not result from a vaccine injury fails to take into account that driving a vehicle more frequently means that tire changes, repairs, and maintenance will be needed more frequently, and will lower the vehicle's trade in value. Reply at *14-15. Thus, Petitioner argues that it is reasonable to compensate petitioners for both the variable and fixed costs of vehicle operation – because both are incurred when driving to and from treatment for a vaccine injury. *Id*. at *15. Petitioner argues that allowing the business rate is not "optimizing," or providing an overly generous award. *Id*. Rather, the business rate is a standard rate that is based on the average cost of operating a vehicle. *Id*.

Respondent contends that the IRS "medical rate" is the appropriate rate for calculation of Petitioner's travel expenses related to medical appointments for his vaccine injury. Resp. at *11. Respondent argues that the special master in *Williams v. Sec'y of Health & Human Servs.*, No. 90-2239V, 1996 WL 608455 (Fed. Cl. Spec. Mstr. Oct. 10, 1996) applied the IRS "business rate" rather than the "medical rate," and that special masters have subsequently relied on *Williams* and applied the business rate. *Id*. In his view, the reasoning of *Williams* is flawed, and urges that I decline to follow it and apply the lower medical rate. Resp. at *12.

### V. Appropriate Compensation in this Case

#### A. Pain and Suffering

Awarding damages is more of an art than a science. In arriving at an award, I review the facts and circumstances of the petitioner before me, in the context of other cases and precedent. GBS is a particularly concerning and frightening condition, and the

pain and suffering award should reflect that. Reasoned decisions, rather than cases resolved on proffer, provide the best comparable cases for arriving at an award when the parties are unable to resolve damages through negotiations.

In this particular case, Petitioner had a moderate case of GBS. Initially he was hospitalized in the intensive care unit, after which he was in an inpatient rehabilitation facility for a month. In the hospital, it took *five* attempts to successfully complete a lumbar puncture that confirmed his diagnosis. He experienced complications from pain medications that resulted in additional procedures. When he was discharged, he could not live independently and had to go to his brother's home rather than his own home. However, he was able to return to his job (with restrictions) just under six months after his illness began.

Although his remaining symptoms and abnormal test results were most apparent in the five months following onset, he continued to experience documented residual effects of his GBS for much longer, including a surgical procedure at fourteen months for his pre-existing erectile dysfunction that no longer responded to prior treatment. Twenty months after onset, he continued to have motor weakness and sensory deficits. Ex. 20 at 9. I find that Petitioner's proposed award is better supported by the record and *applicable* precedent (as I have repeatedly noted that proffers provide poor guidance), and award Petitioner $178,000.00 for actual pain and suffering.

### B. Unreimbursable Expenses and Mileage Rate for Travel Expenses Related to Vaccine Injury

The parties agree on most unreimbursable expenses, as noted, but dispute the rate to be applied for Petitioner's travel related to these expenses I have addressed this question, and Respondent's arguments on the matter, in several recent decisions. *Walter v. Sec'y of Health & Human Servs*., No. 21-1461V, 2024 WL 1299576 (Fed. Cl. Spec. Mstr. Feb. 27, 2024); *Tappendorf v. Sec'y of Health & Human Servs*., No. 20-1592V, 2024 WL 1299566 (Fed. Cl. Spec. Mstr. Feb. 23, 2024); *Kleinschmidt v. Sec'y of Health & Human Servs*., No. 20-0680V, 2023 WL 9119039 (Fed. Cl. Spec. Mstr. Dec. 5, 2023); *Gibson v. Sec'y of Health & Human Servs*., No. 20-0243V, 2022 WL 17820891 (Fed. Cl. Spec. Mstr. Oct. 5, 2022).

In short, despite Respondent's views of *Williams,* I have embraced its holding as more in sync with the remedial goals of the Program (awarding petitioners their actual unreimbursable expenses – which includes not just the operating costs of a vehicle, but also the fixed costs that the "business rate" takes into consideration). *Tappendorf*, 2024 WL 1299566, at *6. As such, application of the business rate results in a reasonable award – not an "optimized" award, as Respondent contends. Accordingly, I award reimbursement for travel expenses related to Petitioner's agreed-upon out-of-pocket expenses at the "business rate." This results in an award of $4,681.77 for Petitioner's

unreimbursed expenses (the agreed-upon expenses of $3,644.49, plus mileage expenses of $1,037.28).

## Conclusion

For all of the reasons discussed above and based on consideration of the record as a whole, **I find that $178,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.[8] I also find that Petitioner is entitled to $4,681.77 in actual unreimbursable expenses and $6,828.80 for lost wages.**

**I therefore award Petitioner a lump sum payment in the amount of $189,510.57 in the form of a check payable to Petitioner.** This amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of the Court is directed to enter judgment in accordance with this Decision.[9]

**IT IS SO ORDERED.**

                                              **s/Brian H. Corcoran**

                                              Brian H. Corcoran
                                              Chief Special Master

---

[8] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[9] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.